IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| **RICHARD BERNARD MOORE,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) Case No.: _____ |
| | ) |
| **HENRY D. McMASTER,** in his personal capacity | ) **COMPLAINT** |
| and in his official capacity as the Governor of South | ) |
| Carolina, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

**COMPLAINT FOR INJUNCTIVE RELIEF AND A DECLARATORY JUDGMENT**

Plaintiff Richard Bernard Moore, by his undersigned counsel, brings this suit against

Defendant Henry D. McMaster and alleges as follows:

**I.**

**PARTIES AND NATURE OF THE ACTION**

1.       This is a suit brought by Plaintiff Moore, under 42 U.S.C. § 1983, seeking

injunctive relief and a declaratory judgment for violations, and threatened violations, of his rights

pursuant to the Due Process Clause of the United States Constitution.

2.       Plaintiff Moore was sentenced to death in Spartanburg County in 2001 for a crime

that occurred in 1999.  He is in the custody of the South Carolina Department of Corrections

("**SCDC**") at the Edisto Unit of Broad River Secure Facility in Columbia, South Carolina.

3.       Defendant Henry D. McMaster is sued herein in his individual and official capacity.

McMaster is currently the Governor of the State of South Carolina, a position he has held since

January 24, 2017.

4.      This case arises from the irreconcilable conflict between Defendant McMaster's former role as Attorney General of South Carolina during the appellate and post-conviction proceedings in Moore's capital case and his current role as Governor of South Carolina and final arbiter in capital clemency proceedings, including any clemency proceedings commenced by Moore.

5.      McMaster and the other members of the Office of the Attorney General, under McMaster's direction, argued in state and federal courts in defense of the death sentence imposed on Moore.  As the Attorney General, the "chief prosecuting officer of the State with authority to supervise the prosecution of all criminal cases,"[1] McMaster was responsible for overseeing criminal prosecutions by the State of South Carolina, including Moore's appellate and post-conviction proceedings.

6.      For Moore to receive clemency, McMaster would have to renounce years of his own work and that of his former colleagues in the Office of the Attorney General.

7.      McMaster's incapacity to serve as a fair and impartial decision-maker in Moore's clemency proceedings is further demonstrated by McMaster's statements to the press that he has no intention to commute Moore's sentence, even though Moore had not applied for or otherwise requested clemency at the time of such statements.

8.      In *Ohio Adult Parole Authority v. Woodard*, the Supreme Court announced that state clemency procedures require, at a minimum, the basic elements of due process.  523 U.S.

---

[1] S.C. Const. art. V, § 24.

272, 288 (1998).[2]  Justice O'Connor explained that, although the procedures at issue in that case did not require the justices to decide what minimal due process protections are essential in clemency proceedings, "[j]udicial intervention" would be warranted "in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Id.* at 289.  Judicial intervention is warranted here.  Considering McMaster's extensive and active participation in defending Moore's death sentence during appellate and post-conviction proceedings and his recent statements, even a coin toss would undoubtedly offer a fairer procedure than a clemency procedure where Moore's clemency application will be decided by a biased arbiter, who has prematurely declared that Moore will not be granted any clemency.

9.    Moore has a right to a clemency proceeding conducted and decided by a neutral, open-minded, and impartial decision-maker, untainted by any prior personal participation in the prosecution or constrained by premature declarations that clemency will not be granted.

10.    To protect Moore's right to have his clemency application reviewed by a neutral, open-minded, and impartial decision-maker, consideration of his clemency petition should be

---

[2] In *Woodard*, Justice O'Connor, joined by three other justices, reasoned that "some *minimal* procedural safeguards apply to clemency proceedings." Although Justice Stevens, writing separately, dissented from the outcome, he agreed with Justice O'Connor's opinion that clemency proceedings were subject to the Due Process Clause.  Justice O'Connor's concurring opinion represents the holding of the Court because it was decided on the narrowest grounds and provided the fifth vote.  *See Romano v. Oklahoma*, 512 U.S. 1, 9 (1994). Other courts have agreed that clemency proceedings constitutionally require minimal procedural safeguards. *E.g.*, *Garcia v. Jones*, 910 F.3d 118, 191 (5th Cir. 2018) (discussing *Faulder v. Tex. Bd. of Pardons & Paroles*, 178 F.3d 343, 344 (5th Cir. 1999)); *Fautenberry v. Mitchell*, 572 F.3d 267, 271 (6th Cir. 2009); *Workman v. Summers*, 111 Fed. Appx. 369, 371 (6th Cir. 2004); *Rhines v. Young*, 941 F.3d 894, 895–96 (8th Cir. 2019); *Lee v. Hutchinson*, 854 F.3d 978, 981 (8th Cir. 2017); *Creech v. Idaho Comm'n of Pardons & Parole*, 94 F.4th 851, 855 (9th Cir. 2024); *Burnsworth v. Gunderson*, 179 F.3d 771, 775 (9th Cir. 1999); *Duvall v. Keating*, 162 F.3d 1058, 1060–61 (10th Cir. 1998); *Gardner v. Garner*, 383 Fed. Appx. 722, 726 (10th Cir. 2010); *Barwick v. Governor of Fla.*, 66 F.4th 896, 903–04 (11th Cir. 2023); *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 794 F.3d 1327, 1330–31 (11th Cir. 2015); *Hall v. Barr*, 830 Fed. Appx. 8, 10 (D.C. Cir. 2020).

removed from the Governor's Office to the South Carolina Board of Paroles and Pardons ("Parole Board").

## II.

## JURISDICTION AND VENUE

11.    This action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution.

12.    The Court has jurisdiction over this action under 28 U.S.C. §§ 1331.

13.    Venue in this Court is proper under 28 U.S.C. § 1391 because the events complained of occurred, and will occur, within this district and Defendant McMaster resides in this district.

## III.

## FACTS

A.    **Defendant McMaster and his Active Involvement in Moore's Prosecution.**

   a.    *Henry McMaster's Public Career.*

14.    McMaster served as a public prosecutor—both federal and state—for approximately twelve (12) years.  He served as a United States Attorney for the District of South Carolina from 1981 to 1985 and as the Attorney General of South Carolina from 2003 to 2011.

15.    In 2014, McMaster was elected Lieutenant Governor of South Carolina.

16.    In January 2017, when South Carolina Governor Nikki Haley was confirmed to the position of the United States Ambassador to the United Nations, McMaster became the 117th Governor of South Carolina.

17.    Subsequently, McMaster won a full four-year term in the 2018 gubernatorial election.  In 2022, McMaster was re-elected to another four-year term as the Governor of South Carolina.

18.    As Governor, McMaster is empowered under Article IV of the Constitution of South Carolina to exercise the power of clemency in capital punishment cases.

19.    McMaster has been an ardent supporter of capital punishment for at least as long as he has sought and held public office.[3]  He has advocated for expanding the reach of the State's death penalty statute to cover non-capital crimes;[4]  and, when the United States Supreme Court held in *Roper v. Simmons*, 541 U.S. 1040 (2004), that death penalty could not be imposed on offenders that were under the age of eighteen when their crimes were committed, McMaster disagreed with the judgment:  "I firmly believe that adult crimes usually deserve adult punishment."[5]

20.    Throughout his career in public life, McMaster has been hostile to the exercise of any discretionary power with regards to criminal sentences.   In particular, McMaster has consistently sought to limit or abolish parole in South Carolina.[6]  Perhaps because of his lengthy service as a public prosecutor, McMaster fails to appreciate the necessity of mercy, clemency, and

---

[3] *See, e.g.,* Henry McMaster, *Experience to get the job done*, THE STATE, October 30, 2002, at A11; *Questioning The Candidates*, THE STATE, May 27, 2002, at B5.

[4] *See* Associated Press, *Senate delays vote on sex offenders*, THE ISLAND PACKET, Mar 24, 2006, at 13 (stating that Attorney General McMaster supported death penalty for repeat sex offenders).

[5] *See* Associated Press, *High court strikes down death penalty for juveniles*, The Index-Journal, Mar 2, 2005, at 7A.

[6] *See* Jason Gertzen, *Lieutenant governor candidate would abolish parole system*, Anderson Independent-Mail, Sept 14, 1989, at 3A.

compassion to temper criminal sentences in certain deserving cases,[7] and the important role played by executive clemency as a "fail safe" mechanism in our criminal justice system. *See Harbison v. Bell*, 556 U.S. 180, 192 (2009) ("Far from regarding clemency as a matter of mercy alone, we have called it the 'fail safe' in our criminal justice system"). *See also Ex Parte Grossman*, 267 U.S. 87, 121–22 (1925) ("Executive clemency exists to afford relief from undue harshness or evident mistake in the operation or enforcement of the criminal law. The administration of justice by the courts is not necessarily always wise or certainly considerate of circumstances which may properly mitigate guilt. To afford a remedy, it has always been thought essential in popular governments, as well as in monarchies, to vest in some other authority than the courts power to ameliorate or avoid particular criminal judgments. It is a check entrusted to the executive for special cases."); *Kansas v. Marsh*, 548 U.S. 163, 193 (2006) (Scalia, J., concurring) ("Reversal of an erroneous conviction on appeal or on habeas, or the pardoning of an innocent condemnee through executive clemency, demonstrates not the failure of the system but its success. Those devices are part and parcel of the multiple assurances that are applied before a death sentence is carried out").

### b.    *Henry McMaster's Prosecution of Plaintiff Moore.*

21.    As South Carolina's "chief prosecuting officer" from 2003 to 2011, McMaster ensured that Moore's conviction and death sentence were vigorously defended by the Office of the Attorney General. McMaster and his office defended Moore's death sentence despite the unique circumstances of the offense that would not typically warrant the death penalty in South Carolina. *See Moore v. Stirling*, 871 S.E.2d 423, 441–42 (S.C. 2022) (J. Hearn, dissenting) ("While there

---

[7] Alexander Hamilton, THE FEDERALIST NO. 74 ("The criminal code of every country partakes so much of necessary severity that without an easy access to exceptions in favor of unfortunate guilt, justice would wear a countenance too sanguinary and cruel"); Justice Anthony Kennedy, *Speech at the American Bar Association Annual Meeting:  An Address by Anthony M. Kennedy*, August 9, 2003 ("A people confident in its laws and institutions should not be ashamed of mercy").

have been individuals executed based on killing a single victim during the commission of an armed robbery, that alone is not dispositive [of whether the death penalty is proportionate to the offense]. . . . I have not found any other case involving a defendant receiving the death penalty where he entered the place of business unarmed. Indeed, the State specifically conceded at oral argument that it could not cite to *any* case in our state with this distinguishing fact. . . . Moore's death sentence is a relic of a bygone era, where he was convicted by a jury comprised of eleven Caucasians and one Hispanic. No African Americans served on the jury, despite several being included in the jury pool.").

22.     By the time McMaster was elected Attorney General in 2003, Moore had been convicted and sentenced to death. However, when Moore appealed his death sentence to the Supreme Court of South Carolina, McMaster was the Attorney General.  Pleadings filed by the State in Moore's direct appeal proceedings were made under his name, and the State's counsel of record—William Edgar Salter, III, and Donald J. Zelenka—were under McMaster's control and supervision.  Under McMaster's direction, the Office of the Attorney General of South Carolina defended the death sentence imposed on Moore.

23.     After Moore's direct appeal was denied and his case went into state post-conviction relief proceedings, McMaster continued to serve as the Attorney General for several years.  Under McMaster's direction, the Office of the Attorney General continued to defend the death sentence imposed on Moore in multiple post-conviction court proceedings.

### c.    *Henry McMaster's Premature Statements.*

24.    McMaster is "not known for discussing individual crimes."[8] However, perhaps because of his previous involvement in Moore's case, McMaster recently made an exception with regards to Moore.  Shortly after the Supreme Court of South Carolina issued a temporary stay in Moore's scheduled firing squad execution, and before Moore submitted any petition or request for clemency, McMaster told reporters that he has "no intention to commute" Moore's sentence.  He continued, "I've seen the record, and there have been many hearings up and down, motions, and this penalty is a very strong response to criminal activity—but it is a necessary response."[9] This reading, however, misunderstands "the heart of executive clemency," as the process is not limited to the court record, and "allow[s] the executive to consider a wide range of factors not comprehended by earlier judicial proceedings and sentencing determinations." *Woodard*, 523 U.S. at 280–81.

25.    McMaster's public announcement that he will not grant clemency to Moore was clearly premature. At that time, Moore had not exhausted his judicial appeals and had not applied for executive clemency.

26.    McMaster's statement that he will deny clemency to Moore was also made without consideration of the substantial facts and circumstances that make Moore's case uniquely suitable for the exercise of executive clemency. Comparison of the crime with which Moore was charged— a convenience store shooting death with both weapons involved originating in the possession of the victim—with other cases before and since shows Moore's case lacks the premeditation and

---

[8] John Monk, *State's most shocking crimes now include Murdaugh killings*, Sun-News, June 21, 2021, at 4A.

[9] John Monk, *SC Gov. McMaster says he won't commute Richard Moore's death sentence*, Sun-News, April 22, 2022, at 2A.

aggravation that typically results in a death sentence. This type of case only results in execution when the legal system has failed in ways that clemency is in place to remedy. Further, over the past twenty years, Moore has worked to make up for his tragic mistakes by being a loving and supportive father, grandfather, and friend. He has an exemplary prison record, and the former director of SCDC supports clemency because Moore would be a "powerful force for good" within the prison system if his sentence was commuted to life without parole. Other governors have granted clemency based on disproportionality of the sentence[10] and evidence of rehabilitation.[11] All of this information would have been presented to McMaster in Moore's clemency application, but McMaster decided to deny clemency before he ever received it.

27.    Although McMaster's statements denying clemency in Moore's case were premature, there is no reason to think McMaster will change his mind.  There is no doubt that in Moore's case, his clemency application would be denied without fair consideration; in fact, the Governor has already said it will be denied.

28.    Other Governors have recognized the need for impartiality in reviewing and deciding on clemency petitions.  In a 2008 amici curiae brief filed with the Supreme Court, several

---

[10] *See, e.g.*, *CLEMENCY: Ohio Governor Grants Fifth Clemency,* Nov. 15, 2010, available at https://deathpenaltyinfo.org/news/clemency-ohio-governor-grants-fifth-clemency (granting clemency, in part, because the death sentence was disproportionate other sentences imposed in similar cases).

[11] *See, e.g.*, *Georgia Prisoner Jimmy Meders Granted Clemency Hours Ahead of Execution,* March 10, 2020, available at *https*://www.americanbar.org/groups/committees/death_penalty_representation/project_press/2020/spring/jimmy-meders-granted-clemency/ (granting clemency in a convenience store murder whether the petitioner had demonstrated he returned to law abiding behavior during his incarceration and earned praise from prison officials).

governors of States that maintain the death penalty[12] noted that "a Governor has the responsibility to enforce the laws of his State impartially and to exercise the clemency power in a manner that promotes fairness, accuracy, and public confidence in the criminal justice system." [13]   In their brief, the governors, writing based on their extensive experience in deciding clemency applications in death penalty cases, emphasized "their responsibility to examine scrupulously each application for clemency in a capital case [by engaging] in a fact-specific inquiry into the circumstances of each case."[14]

29.    Considering McMaster's ardent support for death penalty and his extensive efforts to abolish parole (a system akin to clemency review), the probability that McMaster would grant clemency to any death row inmate is low.  While the beliefs and convictions of a governor alone cannot provide a legitimate basis to disqualify the governor from performing his constitutional duties with regards to clemency applications, in Moore's case, McMaster's actions—namely, his active and extensive defense of Moore's death sentence—certainly disqualify him.  Furthermore, to the extent there were any doubts about whether McMaster could still review Moore's clemency application in a neutral, open-minded, and impartial manner, those doubts were decidedly put to

---

[12] Garrey E. Carruthers, former Governor of New Mexico; Richard F. Celeste, former Governor of Ohio; John J. Gilligan, former Governor of Ohio; James B. Hunt, Jr., former Governor of North Carolina; Gary E. Johnson, former Governor of New Mexico; Joseph E. Kernan, former Governor of Indiana; James G. Martin, former Governor of North Carolina; Ted Strickland, then current Governor of Ohio; John Fife Symington, III, former Governor of Arizona; James R. Thompson, former Governor of Illinois; and Dick Thornburgh, former Governor of Pennsylvania.

[13] Brief of Current and Former Governors as Amici Curiae in Support of Petitioner in *Harbinson v. Bell*, 2008 WL 4264488 at 8 (emphasis added).

[14] *Id.*

rest by his premature public declaration that McMaster, as Governor, will not grant clemency to Moore.

**B.**     **Executive Clemency In South Carolina.**

   ***a.   Background.***

30.     Historically, executive clemency was an integral part of the criminal justice system in the United States, including the State of South Carolina.[15]  Specifically, under South Carolina's 1790 Constitution, the Governor was granted broad clemency powers.[16]  These broad clemency powers of the Governor continued under the 1895 Constitution; however, the 1895 Constitution established a discretionary mechanism by which the Governor could refer petitions for clemency to the Parole Board.[17]  Section 24-21-910 of the South Carolina Code contains a similar discretionary mechanism under which the Governor has the option to refer petitions for clemency to the Parole Board.[18]

31.     In 1949, a constitutional amendment shifted control of the clemency power from the Governor's exclusive purview to the Parole Board.  The sole arena in which the Governor's

---

[15] *See, e.g.*, L. Radzinowicz, *A History of English Criminal Law and Its Administration from 1750*, at 114–16 (1948) (noting that youth, first offense, provocation, and the non-aggravated nature of a crime were among the historical factors in clemency decisions).

[16] S.C. CONST. art. II, § 7 (1790) (vesting in the Governor the "power to grant reprieves and pardons, after conviction, except in cases of impeachment, in such manner, on such terms, and under such restrictions, as he shall think proper").

[17] *Compare* S.C. CONST. art. II, § 7 (1790) *with* S.C. CONST. art. IV, § 11 (1895) (imposing on the Governor a "duty to report to the General Assembly . . . all pardons granted by him" and authorizing the Governor to refer a petition for clemency "to a Board of Pardons, to be provided to the General Assembly, which Board shall hear all such petitions…The Governor may adopt the recommendations of said Board, but in case he does not he shall submit his reasons to the General Assembly.").

[18] *See* ¶ 37 *infra.*

power remained central was the power to grant reprieves and to commute sentences of death to life imprisonment.[19]

32.    Even in death penalty cases, however, the statute and the State Constitution still contemplated that the Parole Board would play an important role, and the Governor regularly exercised his authority to refer a clemency petition to the Parole Board, which would issue a recommendation to the Governor.[20]

33.    When the Governor referred a petition to the Parole Board, the Governor could decline to follow the Parole Board's recommendation, but only if he submitted a report to the General Assembly detailing his reasons for deviating from the Parole Board's recommendation.[21] In all cases, it was understood that the Governor would "investigate each case and if the circumstances warrant[ed], in his opinion as Chief Executive, then he should act and would act based, not upon his personal feelings, but upon the facts and the justice in each case before him."[22]

34.    The 1949 amendment was part of then-Governor Strom Thurmond's efforts to end corruption in the pardon and clemency process. In Governor Thurmond's words, "[n]othing has done more in the past to undermine respect for law than the abuse of the pardoning power," which

---

[19] 1949 S.C. Acts 40 § 1 (amending S.C. CONST. art. IV, § 11 (1895)).

[20] *See* 1959 S.C. Op. Att'y Gen., 1959 WL 10434, at *1 (July 17, 1959). For example, then Governor Blackwood granted clemency to George Jackson in 1932 based on a board recommendation. Similarly, Governor Johnson granted James Kearse clemency in 1938 following a board recommendation to do so.

[21] *See* 1959 S.C. Op. Att'y Gen., 1959 WL 10434, at *1 (July 17, 1959).

[22] *Id.*

previous governors had used to purchase political influence.[23]  The structure of the Parole Board prevented any governor from appointing more than two members, a mechanism specially designed to root out arbitrary decisions by the Parole Board and to "safeguard the exercise of clemency."[24] Thus, the Governor's power to exercise executive clemency in South Carolina stems from the vesting of a quasi-administrative, quasi-judicial power in the executive office.

35.    In practice, the Governor and the Parole Board regularly exercised the clemency power.  From 1948 to 1972, out of fifty-eight (58) death sentences in South Carolina, twenty-eight (28) (approximately 48.3%) of them were commuted.  This practice reflects the importance of clemency in the fabric of the Anglo-American justice system in general and in South Carolina in particular. Clemency has for decades been "part and parcel of the multiple assurances that are applied before a death sentence is carried out." *Kansas v. Marsh*, 548 U.S. 163, 193 (2006) (Scalia, J., concurring).

36.    In this sense, clemency exists as a means of ensuring that innocent people are not put to death and that only those individuals who are the "worst of the worst" are executed, leading observers to describe the judge as the thirteenth juror and the Governor as the fourteenth.[25]  "[T]he culpability of the average murderer is insufficient to justify the most extreme sanction available to the State," and clemency ensures that defendants whose crimes do not reflect "a consciousness materially more depraved than that of any person guilty of murder" do not suffer the most severe

---

[23] *See* Annual Message of J. Strom Thurmond, Governor of South Carolina, to the General Assembly at 6 (Jan. 12, 1949).

[24] *Id.*

[25] *See* Hearing Before the Subcommittee on Criminal Justice of the Committee on the Judiciary, H.R. 13360, at 139 (1978); *A Matter of Life and Death: Due Process Protections in Capital Clemency Proceedings*, 90 Yale L.J. 889, 897 n.38 (1981) (collecting examples of clemency as a safeguard against arbitrary jury action).

punishment available to the State. *Atkins v. Virginia*, 536 U.S. 304, 319 (2002) (quotation marks omitted).

37.    Article IV, Section 14 of the South Carolina Constitution provides: "With respect to clemency, the Governor shall have the power only to grant reprieves and to commute a sentence of death to that of life imprisonment.  The granting of all other clemency shall be regulated and provided for by law."  It is noteworthy that under this article, the framers of the South Carolina Constitution have not vested absolute clemency authority in the Governor.  Instead, the Governor has the sole authority to "grant reprieves and to commute a sentence of death to that of life imprisonment;" in all other areas, clemency shall be granted in accordance with the applicable law, which provides for the participation of the Parole Board.  *See Bearden v. State*, 223 S.C. 211, 214, 74 S.E.2d 912, 913 (1953).

38.    In addition, Section 24-21-910 of the South Carolina Code provides the Governor with the option to refer petitions for reprieves or the commutation of a sentence of death to life imprisonment to the Parole Board.  Section 24-21-910, consistent with South Carolina's past practice, requires that if the Governor opts to refer a petition for reprieve or the commutation of a death sentence to the Parole Board and the Governor fails to follow the recommendation of the Parole Board, then the Governor shall submit his reasons for failing to follow the Parole Board's recommendations to the General Assembly.

39.    In sum, since 1949, the Parole Board has exercised the sole authority in South Carolina to grant pardons and to issue and revoke paroles, other than with regards to granting reprieves and commuting death sentences to life imprisonment sentences and has served as an important advisor to the Governor with regards to petitions seeking reprieves and commutation of death sentences to life imprisonment sentences.  Considering the Parole Board's expertise and

experience in matters relating to clemency and the recognition of its expertise by the General Assembly as set forth in Section 24-21-910 of the South Carolina Code, it would be the most suitable candidate to replace Governor McMaster as a decision-maker in Moore's clemency proceedings.

### b. *Importance of Robust Clemency Proceedings.*

39.     Clemency, which "is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted,"[26] is an essential "fail safe" mechanism in our criminal justice system.[27] In *Ex parte Grossman*, Chief Justice Taft observed:

> Executive clemency exists to afford relief from undue harshness or evident mistake in the operation or enforcement of the criminal law.  The administration of justice by the courts is not necessarily always wise or certainly considerate of circumstances which may properly mitigate guilt.  To afford a remedy, it has always been thought essential in popular governments, as well as in monarchies, to vest in some other authority than the courts power to ameliorate or avoid particular criminal judgments.  It is a check entrusted to the executive for special cases.

267 U.S. 87, 120–121 (1925).

40.     Over the last half century, as the balance between the State's interest in the finality of criminal convictions and a defendant's countervailing interest in robust post-conviction

---

[26] *Herrera v. Collins,* 506 U.S. 390, 412 (1993).

[27] *Id.* at 415 ("Executive clemency has provided the 'fail safe' in our criminal system").

proceedings has decidedly tipped in favor of the State,[28] the need for robust clemency proceedings has understandably increased. In the case of South Carolina's death row inmates, the need for meaningful access to robust clemency proceedings has become particularly acute for three principal reasons: South Carolina has abolished its traditional independent review in death penalty cases for legal errors that may not have been properly preserved;[29] under South Carolina's draconian rules for error preservation, there is a heightened risk that meritorious claims of criminal defendants could be inadvertently waived (especially where indigent defendants fail to receive effective assistance of counsel),[30] and the scope of federal habeas review has been so dramatically narrowed that the writ of habeas corpus has effectively been rendered unavailable.[31] The cumulative effect of these developments is that the risk of unjust executions under South Carolina's death penalty laws has substantially increased. Therefore, it is essential that death row inmates in South Carolina are guaranteed meaningful access to fair and robust clemency proceedings, the traditional "fail safe" mechanism in our criminal justice system. *See Harbison v.*

---

[28] *See Edwards v. Vannoy,* 141 S. Ct. 1547, 1570–72 (2021) (Gorsuch, J., concurring, extolling the benefits of finality and tracing the recent history of the Supreme Court's judgments that seek to promote finality of state court convictions: "Hard experience [has] reminded the Court that finality, 'the idea that at *some* point a criminal conviction reaches an end, a conclusion, a termination, 'is *essential* to the operation of our criminal justice system' [citations omitted]") (emphasis in original); *see also Calderon v. Thompson*, 523 U.S. 538, 555–56 (1998) ("Finality is essential to both the retributive and the deterrent functions of criminal law…Finality also enhances the quality of judging…Finality serves as well to preserve the federal balance. Federal habeas corpus of state convictions frustrates 'both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.").

[29] *See* ¶ 41 *infra*.

[30] *See* ¶ 42 *infra*.

[31] *See* ¶ 43-46 *infra*.

*Bell*, 556 U.S. 180, 195 (2009) ("…no prisoner should be put to death without meaningful access to the 'fail-safe' of our justice system.").

41.    Traditionally, under the doctrine of *in favorem vitae* (which literally means "in favor of life"),[32] South Carolina's Supreme Court conducted an independent review of the record in death penalty cases to search for legal errors not properly preserved.[33] In *State v. Torrence,* the Court abrogated its use of *in favorem vitae* review, accepting the state's argument that "historical and legal developments have rendered *in favorem vitae* obsolete." 305 S.C. 45, 51, 406 S.E.2d 315, 319 (1991). The abolition of the doctrine of *in favorem vitae* has deprived death row inmates of a critical safeguard.[34] In fact, of the eleven South Carolina capital convictions reversed between 1962 and 1972, seven were reversed after *in favorem vitae* review.[35]

42.    South Carolina's Supreme Court not only abrogated its independent review in death penalty cases for errors not properly preserved, but also has adopted stringent rules for preserving errors for future appellate review.[36]  To preserve an error for appellate review under South

---

[32] *See State v. Torrence,* 305 S.C. 45, 51, 406 S.E.2d 315, 319 (1991).

[33] *See State v. Swilling*, 246 S.C. 144, 147, 142 S.E.2d 864, 865 (1965) ("In keeping with…in favorem vitae, we have not only considered the exceptions on appeal and the questions briefed and orally argued…, but we have also independently searched the record for prejudicial error, whether or not objected to below or made a ground of exception here").

[34] For an analysis of *in favorem vitae* review as an expression of "deeply felt doubts within that system of justice of the propriety of capital punishment itself," *see* Laughlin McDonald, *Capital Punishment in South Carolina:  The End of an Era*, 24 S.C. L. Rᴇᴠ. 762, 774–80 (1972).

[35] *See State v. Richburg*, 250 S.C. 451, 158 S.E.2d 769 (1968); *State v. Bell*, 250 S.C. 37, 156 S.E.2d 313 (1967); *State v. Gamble*, 247 S.C. 214, 146 S.E.2d 709 (1966); *State v. Cain*, 246 S.C. 536, 144 S.E.2d 905 (1965); *State v. Swilling*, 246 S.C. 144, 142 S.E.2d 864 (165); *State v. White*, 246 S.C. 502, 144 S.E.2d 481 (1965); *State v. White*, 243 S.C. 238, 133 S.E.2d 320 (1963).

[36] *See generally* John H. Blume and Pamela A. Wilkins, *Death by Default:  State Procedural Default Doctrine in Capital Cases*, 50 S.C. L. Rᴇᴠ. 1 (1998).

Carolina's stringent rules, the objection should be sufficiently contemporaneous,[37] the objection must be made the first time the alleged error is committed,[38] and the objection must precisely specify all relevant grounds.[39] On appeal, there is a bar against supplementing any alternate grounds that were not previously mentioned or properly objected to.[40] South Carolina's rules for error preservation are beset with countless traps for unwary litigators. For example, the Supreme Court of South Carolina has held that even when defense counsel makes a contemporaneous objection, the issue is not preserved for appellate review if the trial court offers a curative instruction and counsel refuses the instruction.[41] Instead, defense counsel should allow the curative instruction offered by the court and then object to the sufficiency of the curative

---

[37] *See State v. Hoffman*, 312 S.C. 386, 393, 440 S.E.2d 869, 873 (1994); *State v. Torrence*, 305 S.C. 45, 69, 406 S.E.2d 315, 328 (1991) (Toal, J., concurring).

[38] *See State v. Somerset*, 276 S.C. 220, 221, 277 S.E.2d 593, 594 (1981).

[39] *See Broom v. Southeastern Highway Construction Co.,* 291 S.C. 93, 107, 352 S.E.2d 302, 310 (Ct. App. 1986). Although *Broom* was a civil case, the same principle applies in criminal cases. *See, e.g., State v. Hoffman*, 312 S.C. 386, 393, 440 S.E.2d 869, 873 (1994) (finding that the trial judge properly admitted certain evidence because defense counsel's objection was, among other things, "very broadly made").

[40] *See State v. Byram*, 326 S.C. 107, 485 S.E.2d 360 (1997) (refusing to consider the defendant's argument that he should have been permitted to introduce, in mitigation of punishment, information regarding the identity of the alleged accomplice mentioned in the defendant's confessions because, at trial, the defendant offered the evidence to bolster his other statements, not to mitigate punishment). *See also State v. Humphries*, 325 S.C. 28, 479 S.E.2d 52, 56 (holding arguments were unpreserved where defense counsel objected to victim impact evidence at trial for lack of notice, but alleged on appeal that the evidence was excessive, and the prosecutor's acts were prejudicial).

[41] *See, e.g.*, *State v. Tucker*, 324 S.C. 155, 168-169, 478 S.E.2d 260, 267 (1996) (holding that the appellant waived his objection by refusing trial judge's offer of a curative instruction).

instruction or move for a mistrial to preserve the alleged error for future appellate review.[42]  The impact of South Carolina's error preservation rules is further exacerbated by the consistent refusal of South Carolina's courts to apply a "plain error" rule,[43] which is typically employed by most states with the death penalty to ameliorate the harsh outcomes under strict error preservation rules by considering significant issues not preserved at trial.[44]  Because of South Carolina's draconian error preservation rules and due to the absence of the plain error rule, the probability that defense counsel will inadvertently waive meritorious claims of the defendant is dangerously high. As discussed below, procedurally defaulted claims are, with limited exceptions, not reviewed by federal habeas courts.

43.     Perhaps most importantly, Congress and the Supreme Court of the United States have so dramatically restricted the scope of federal habeas corpus review that often a death row inmate with meritorious federal claims does not have an opportunity to raise these claims in federal court, let alone have the good fortune of being awarded a suitable remedy, even for seemingly

---

[42] *See, e.g.*, *State v. George,* 323 S.C. 496, 510, 476 S.E.2d 903, 912 (1996) (holding that an objection to the introduction of character evidence is not preserved if counsel does not "make an additional objection to the sufficiency of the curative charge or move for a mistrial").

[43] *See Jackson v. Speed*, 326 S.C. 289, 307, 486 S.E.2d 750, 759 (1997) ("This Court has consistently refused to apply the plain error rule.")

[44] *See generally* John H. Blume and Pamela A. Wilkins, *Death by Default:  State Procedural Default Doctrine in Capital Cases*, 50 S.C. L. Rev. 1, 31-42 (1998) (outlining the benefits of the plain error rule and advocating South Carolina's adoption of this rule that is commonly employed by other States with death penalty).

clear constitutional violations.[45]  In this petition, we do not intend to catalog the numerous hurdles

that legislative and judicial actions have established to foreclose federal habeas review.[46] Instead,

for illustrative purposes, we shall primarily focus on three such hurdles—restrictions relating to

procedurally defaulted claims and ineffective assistance of counsel claims, and the deferential

standard employed by federal habeas courts in reviewing federal law determinations.

44.    In general, a federal habeas court is barred from reviewing any claims that have

been procedurally defaulted in state court proceedings. *McCarver v. Lee*, 221 F.3d 583, 588 (4th

Cir. 2000).  There is, however, a narrow exception to the general bar against federal habeas review

of procedurally defaulted claims where the petitioner "can demonstrate cause for the default and

actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to

consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*,

501 U.S. 722, 750 (1991).  This restriction, in combination with South Carolina's stringent error

preservation rules, often results in forfeiture of otherwise meritorious federal claims held by death

row inmates from South Carolina.

45.    Another example of the types of restraints that federal courts have imposed on

prisoners' ability to file habeas corpus petitions is the recent Supreme Court decision in *Shinn v.*

---

[45] Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences*, 113 MICH. L. REV. 1219, 1220 (2015) ("[A]ny participant in our habeas regime would have to agree that it resembles a twisted labyrinth of deliberately crafted legal obstacles that make it as difficult for habeas petitioners to succeed in pursuing the Writ [of habeas corpus] as it would be for a Supreme Court Justice to strike out Babe Ruth, Joe DiMaggio, and Mickey Mantle in succession—even with the Chief Justice calling balls and strikes").

[46] *See generally* Brandon L. Garrett & Kaitlin Phillips, *AEDPA Repeal*, 107 CORNELL L. REV. 1739 (2022); Diane P. Wood, *The Enduring Challenge for Habeas Corpus*, 95 NOTRE DAME L. REV. 1809 (2020).

*Ramirez*, 142 S. Ct. 1718 (2022). In general, capital petitioners have actively sought federal habeas review of ineffective assistance of counsel claims.[47] Typically, a capital petitioner's ineffective assistance claim alleges the failure of defense counsel to assert a possibly meritorious claim in state courts; and often the meritorious claim that defense counsel has failed to assert is one that cannot be directly litigated on its merits in federal courts because of procedural or substantive restraints under extant federal habeas jurisprudence. Simply put, ineffective assistance claims in federal habeas litigation are often based on otherwise defaulted claims. Ineffective assistance claims, by providing an alternative for presenting claims that are otherwise barred for consideration by federal courts, have served as "a safety valve to otherwise harsh substantive and procedural barriers to habeas petitioners."[48] Until recently, the Supreme Court has not sought to restrain such use of ineffective assistance claims. In *Martinez v. Ryan*, 566 U.S. 1 (2012),[49] the Supreme Court recognized a narrow exception to the rule established in *Coleman* and held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."[50] However, in *Shinn*,

---

[47] *See* Nancy J. King, Fred L. Cheesman, and Brian J. Ostrom, FINAL TECHNICAL REPORT: HABEAS LITIGATION IN US DISTRICT COURTS at 28 (2007) ("81% (299) of the capital [federal habeas] cases included at least one claim alleging the ineffective assistance of counsel. 123 of these cases raised at least one [ineffective assistance of counsel] claim regarding *appellate* counsel") (emphasis in original).

[48] Tom Zimpleman, *The Ineffective Assistance of Counsel Era*, 63 S.C. L. REV. 425, 426 (2011).

[49] *See Martinez*, 566 U.S. at 17 (2012) ("Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective").

[50] *Id.* at 15.

the Supreme Court has effectively hollowed out the *Martinez* exception by holding that Section 2254(e)(2) of the Anti-Terrorism and Effective Death Penalty Act forbids, with limited exceptions, the federal court from holding an evidentiary hearing if the habeas petitioner "has failed to develop the factual basis of a claim in State court proceedings."  Considering that ineffective assistance claims frequently turn on errors of omission, such as failure to investigate, proof of such ineffectiveness will, by definition, be outside the state court record.[51]  *Shinn* will undoubtedly hamper capital habeas petitioners' ability to effectively litigate claims of ineffective assistance of counsel.[52]  It erects yet another formidable procedural barrier for habeas petitioners with meritorious claims to overcome and is a telling example of the Supreme Court's continuing efforts to narrow the scope of federal habeas corpus.[53]

46.     When a capital petitioner raises a claim that was adequately raised and preserved in state courts, the petitioner can be granted relief only if he can demonstrate the state court decision is contrary to or an unreasonable application of clearly established federal law.  This test

---

[51] *Id.* at 12 ("…the evidentiary basis for a claim of ineffective assistance…often turns on evidence outside the trial record"); *see also id.* at 13 ("Ineffectiveness-assistance claims often depend on evidence outside the trial record.  Direct appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the claim").

[52] Daniel S. Medwed, *Ineffective Assistance of Case Law: The Supreme Court's Deficient Habeas Jurisprudence,* 17 HARVARD LAW & POLICY REVIEW 345 (2024) ("Going forward, *Ramirez* could make the road to freedom nearly impassable for prisoners who want to rely on [ineffective-assistance-of-counsel] claims…in a federal habeas corpus action.").

[53] *See Row v. Miller*, No. 1:98-cv-00240-BLW, 2023 WL 2744409 (D. Idaho 2023) ("The great writ is an extraordinary remedy that should be granted only if an extreme malfunction occurred in the state criminal justice systems.  This case clearly fits this description.  However, under the current state of the law, the Court can do nothing to provide a remedy to Petitioner.  This is a direct consequence of…expedited justice for death penalty cases [in Idaho], coupled with the equally harsh and unforgiving limitations imposed by [federal legislation] on habeas proceedings in federal court.  And now we have the Supreme Court's decision in [*Shinn*] – holding that, under [relevant federal legislation], the Petitioner has no federal remedy for a violation of her constitutional rights, even when her state court attorneys were shockingly inept.  Thus, in this case the 'great writ' is reduced to a meaningless exercise in futility." (internal quotation marks and citations omitted)).

has been construed by the Supreme Court to show extreme deference to state courts' determinations of federal law. "[A] habeas court must determine whether arguments or theories supported or [] could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Court." *See Harrington v. Richter*, 562 U.S. 86, 102 (2011). In a recent 2022 opinion, the Court restated this standard to require even greater deference to state courts: "[A] petitioner must persuade a federal court that *no* fairminded jurist could reach the state court's conclusion under [the Supreme] Court's precedents." *Brown v. Davenport*, 142 S. Ct. 1501, 1525 (2022) (internal quotation marks omitted) (emphasis added). In *Brown v. Davenport*, Justice Gorsuch, writing for the majority, explained that the test is not "whether a federal habeas court *itself* harbors grave doubt about the [state court's] verdict;" but "whether *every* fairminded jurist would agree that an error [in state court's verdict] was prejudicial." *Id.* (emphasis in original); *see also Cavazos v. Smith*, 565 U.S. 1, 2 (2011), ("[federal habeas] judges will sometimes encounter convictions that they believe to be mistaken, but they must nonetheless uphold [such mistaken convictions])." The Supreme Court has acknowledged the difficulty in satisfying this test: "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102.

47.    In short, Congress and the Supreme Court have effectively made federal habeas review unavailable in the vast majority of cases. The statistics speak for themselves: A recent

study of reversal rates in capital cases in Texas from 2000 through 2020 noted that "of the 151 completed federal habeas proceedings, inmates were ultimately successful in a single case." [54]

48.    Regardless of one's perspective regarding the current trend that clearly prioritizes a state's interest in finality of criminal convictions over a defendant's countervailing interest in a fair trial and robust post-conviction appeals process, it is undeniable that this current trend has the potential to substantially increase the risk of unjust executions.  In South Carolina, there are only two tools for managing this critical risk: obtaining a writ of habeas corpus from the Supreme Court of South Carolina[55] and executive clemency.

49.    In the post-litigation phase, executive clemency is the sole and ultimate check on the State's authority to deprive life.  *See Harmelin v. Michigan*, 501 U.S. 957, 1008 ("Executive or legislative clemency [in the post-sentencing phase] provide[s] means for the State to avert or correct unjust sentences.").  Executive clemency is the only "fail safe" mechanism after a capital defendant has exhausted his judicial remedies and, therefore, it is of utmost importance that a capital defendant like Moore is provided meaningful access to clemency in full compliance with the Due Process Clauses of the federal and state constitutions.

---

[54] *See* David R. Dow & Jeffrey R. Newberry, *Reversal Rates in Capital Cases in Texas*, 2000 – 2020, 68 UCLA L. Rev. Discourse 2 (2020) (comparing three studies of success rates in capital federal habeas cases:  a nationwide study examining every capital case from 1973 through 1995 calculated "success rate in federal habeas proceedings [by capital petitioners] of almost 40 percent;" a study for all federal habeas applications between January 2000 and January 2007 "revealed that, in the aggregate, death row inmates had a nationwide success rate of around 12 percent…[showing] significant variations among jurisdictions and federal circuits;" and a 2000 – 2020 study of reversal rates in capital cases in Texas found that of the 151 completed federal habeas proceedings, inmates were ultimately successful in a single case").

[55] *Torrence,* 305 S.C. at 69, 406 S.E.2d at 328 ("'[W]e do not relinquish entirely our ability to provide relief to those who have, for whatever reason, been utterly failed by our criminal justice system…an imprisoned individual may obtain a writ of *habeas corpus* from [South Carolina's Supreme] Court after exhausting all other sources of relief, "where there has been a 'violation, which, *in the setting*, constitutes a denial of fundamental fairness shocking to the universal sense of justice.'").

# IV.

## CLAIMS FOR RELIEF

### Count I:  Due Process Violation Under
### the Fourteenth Amendment to the Constitution of the United States

50.     Plaintiff incorporates by reference each statement, and each allegation, set forth in this Complaint as if fully set forth herein.

51.     This Claim for Relief is grounded in Moore's cognizable liberty interest in his continued life and his right, under the Due Process Clause of the United States Constitution, not to be deprived of his life without due process of law.

52.     The Supreme Court has consistently recognized that "capital punishment [must] be imposed fairly, and with reasonable consistency, or not at all." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982).  To ensure that the most fundamental right—right to life—is not unfairly or arbitrarily extinguished, the State of South Carolina has provided an additional safeguard—the authority to grant clemency.  *See Ford v. Wainwright*, 477 U.S. 399, 409 (1986) (plurality opinion) (recognizing the "fundamental right to life").

53.     In *Woodard*, the Supreme Court announced that state clemency procedures require, at a minimum, the basic elements of due process. 523 U.S. at 288 (1998) (O'Connor, J., concurring in the result).  This requirement is consistent with the Supreme Court's earlier observation that "there can be no doubt that at a minimum [the Due Process Clause] requires that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313 (1950).  *See also Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 617 (1993) ("due process requires a neutral and detached judge in the first instance") (internal citations and quotation marks omitted).  With

regards to an executive clemency proceeding, the phrase "hearing appropriate to the nature of the case" would at a minimum require the hearing to be presided over by an unbiased decision-maker. *See, e.g., Hamdi v. Rumsfeld*, 542 U.S. 507, 531 (2004) (holding that, under the Due Process Clause, a citizen-detainee—even one that had been captured in an active combat zone in Afghanistan fighting with a Taliban unit—"seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a *neutral decisionmaker*.") (emphasis added). Accordingly, a state clemency procedure must satisfy the three basic requirements of due process: (1) notice and (2) an opportunity to be heard (3) before an unbiased decision-maker, untainted by any prior personal participation in the prosecution or bound by premature declarations that no mercy will be shown in a given case. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980); *Mathews v. Eldridge*, 424 U.S. 319 (1976).

54.     In *Woodard*, Justice O'Connor's coin flip example evokes a procedure for granting clemency that would be so arbitrary that it would clearly not meet the minimal due process requirements that a constitutional clemency procedure must satisfy under the United States Constitution. *See Woodard*, 523 U.S. at 289 (1998) (Justice O'Connor explaining that "a scheme whereby a state official flipped a coin to determine whether to grant clemency" would fail to meet the due process requirements imposed by the United States Constitution). A logical extension of Justice O'Connor's coin flip example is that if determining clemency by flipping a coin or rolling a die is unconstitutional, then determining clemency with a weighted coin or loaded die would also

fail to satisfy the due process requirements under the United States Constitution.[56]  Accordingly, if McMaster is permitted to conduct and decide Moore's clemency proceedings, considering his inherent conflict and actual biases (attested by his recent statements), Moore's clemency would in fact be decided by a weighted coin or loaded die, which would undeniably fail to satisfy the Due Process Clause under the United States Constitution.

55.    In *Woodard*, Justice O'Connor also offered another example of state action that would clearly fall afoul of the due process requirements that clemency proceedings must satisfy – namely, where "the State arbitrarily denied a prisoner any access to its clemency process."  *See Woodard*, 523 U.S. at 289 (1998).  By prematurely deciding Moore's clemency application when Moore had not exhausted his judicial appeals and had not applied for clemency, McMaster has arbitrarily denied Moore access to the clemency process and violated his due process rights.

56.    In exercising the clemency power, the Governor has been granted the authority to confirm or undo, partially or wholly, the decisions of juries and judges and, therefore, acts as "both quasi-judge and quasi-jury."[57]  Because the power to grant clemency is a quasi-judicial act, the rules of recusal should apply to the clemency process in the same manner they apply to judges. *See Tumey v. Ohio,* 273 U.S. 510, 522 (1927) ("That officers acting in a judicial or quasi-judicial capacity are disqualified by their interest in the controversy to be decided is, of course, the general rule."). In carrying out this obligation, "the heart of executive clemency . . .allow[s] the executive

---

[56] Jay Clayton, *Vindicating the Right to be Heard:  Due Process Safeguards against Government Interference in the Clemency Process*, 88 U. CHI. L. REV. 897, 924–25 (2021) ( "It would be an implausible conception of due process indeed to forbid determining clemency by flipping a coin or rolling a die but permit determining clemency with a weighted coin or loaded die.").

[57] Brian C. Kalt, *Pardon Me:  The Constitutional Case against Presidential Self-Pardons*, 106 YALE L. J. 779, 796 (1996).

to consider a wide range of factors not comprehended by earlier judicial proceedings and sentencing determinations." *Woodard*, 523 U.S. at 280–81.

57.    The United States Supreme Court has recognized that allowing an individual who previously advocated for the State against a criminal defendant to later sit in judgment over that defendant's case violates the defendant's due process rights:

> The due process guarantee that 'no man can be a judge in his own case' would have little substance if it did not disqualify a former prosecutor from sitting in judgment of a prosecution in which he or she had made a critical decision. . . . When a judge has served as an advocate for the State in the very case the court is now asked to adjudicate, a serious question arises as to whether the judge, even with the most diligent effort, could set aside any personal interest in the outcome. . . . A prosecutor may bear responsibility for any number of critical decisions, including what charges to bring, whether to extend a plea bargain, and which witnesses to call. Even if decades intervene before the former prosecutor revisits the matter as a jurist, the case may implicate the effects and continuing force of his or her original decision. In these circumstances, there remains a serious risk that a judge would be influenced by an improper, if inadvertent, motive to validate and preserve the result obtained through the adversary process.

*Williams v. Pennsylvania*, 136 S. Ct. 1899, 1906–07 (2016).  "No attorney is more integral to the accusatory process than a prosecutor who participates in a major adversary decision."  *Id.* at 1906.

58.    The same fundamental principle of due process produced the *per se* recusal rule in South Carolina post-conviction proceedings. "[A]s a matter of policy" in all post-conviction relief hearings in South Carolina, "a judge shall, upon motion, recuse himself if he was the judge who presided at the guilty plea, criminal trial, or probation revocation proceeding for which relief is being sought." *Floyd v. State*, 303 S.C. 298, 298, 400 S.E.2d 145, 146 (1991); *see also Clemmons v. Wolfe*, 377 F.3d 322, 329 (3d Cir. 2004) (a district court judge's failure to recuse from considering a habeas petition involving a trial over which the judge had presided "created an appearance of impropriety that runs 'the risk of undermining the public's confidence in the judicial process'" (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988))).  Such

adherence to the due process requirement of an impartial decision-maker "reflect[s] a profound judgment about the way in which law should be enforced and justice administered." *Duncan v. Louisiana*, 391 U.S. 145, 155 (1968).

59.    Even if the decision to grant or deny clemency is characterized as a strictly administrative decision that is not quasi-judicial in any manner,[58] due process still requires a fair opportunity to be heard before a neutral decision-maker just as it does in parole hearings, which are "traditionally handled by administrative officers." *Morrissey v. Brewer*, 408 U.S. 471, 486, 489 (1972) (holding that even though "[t]he granting and revocation of parole are matters traditionally handled by administrative officers," due process requires parole revocation hearings to satisfy certain minimal requirements including that the hearing must be conducted by "a 'neutral and detached' hearing body such as a traditional parole board").

60.    That no man should be judge in his own case is a bedrock principle of natural justice and constitutionalism.  It is applicable with equal force to all branches of the government—judicial, legislative, and executive.  The Supreme Court calls it "a mainstay of our system of government." *Gutierrez de Martinez v. Lamango*, 515 U.S. 417, 428 (1995) (the Court traces the principle's long history from political philosophers—Publius Syrus and Blaise Pascal—to the writings of Blackstone and the Supreme Court cases of *Spencer v. Lapsley*, 61 U.S. (20 How) 264 (1857) and *In re Murchison*, 349 U.S. 133 (1955)).  The Court has often applied this bedrock

---

[58] While this argument is offered in the alternative, it is Moore's position that the exercise of clemency power by the Governor is a quasi-judicial action which should be governed by the same recusal rules as applicable to the judiciary in general.

principle to not only the judicial branch, but also the legislative and the executive branches.[59]  This

principle has been extended well beyond judging in the strict sense to cover decisions by different

types of officials in many kinds of institutions.[60]  Accordingly, there can be little doubt that a

governor in exercising his clemency powers, regardless of whether they are deemed quasi-judicial,

is subject to the principle that no one can be a decision-maker in a matter in which he has a vested

interest. Defendant McMaster, with his history of defending Moore's sentence as the chief

prosecutor in South Carolina, is in no position to comply with this bedrock principle of our system

of government.

61.     When Defendant McMaster declared that he had "no intention to commute"

Moore's sentence, he effectively ruled on Moore's clemency application, which Moore has not yet

filed.  This denial failed to satisfy any of the three procedural due process requirements: (1) Moore

did not receive any prior notice that his clemency case was being considered; (2) Moore was not

---

[59] *See, e.g., Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 123 (2011) (applying the principle to the legislative branch; noting the principle that legislators should recuse themselves from voting on questions in which they have a personal interest because "the fundamental principles of the social compact [bar]…any man to be a judge in his own case" (quoting Thomas Jefferson, A MANUAL OF PARLIAMENTARY PRACTICE FOR THE USE OF THE SENATE OF THE UNITED STATES 31 (1801)); *Berger v. United States*, 295 U.S. 78, 88 (1935) (applying the principle to the executive branch – "The United States Attorney is the representative not of an ordinary party to a controversy; *but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all*; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done"—and ordering a new trial, in part, because of the prosecutor's lack of impartiality and other prosecutorial misconduct during the trial phase) (emphasis added).

[60] *See, e.g.,* 5 U.S.C. § 554(d)(2)(C)(the Administrative Procedure Act requires that agency personnel that investigate and prosecute a matter do not also adjudicate the same matter); THE FEDERALIST NO. 10 (James Madison applying the principle to the legislative branch in discussing the tendency of legislative majorities to make biased and partisan decisions argued that "[n]o man is allowed to be judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity"); and Marc Lacey, *Arizona Governor and Senate Oust Redistricting Leader*, N.Y. TIMES, Nov. 2, 2011 (discussing Republican governor's objections to the chairwoman of Arizona's independent redistricting commission for being biased in favor of Democrats).

provided with an opportunity to be heard and provide information relevant to his case; and (3) the application was decided by a former state prosecutor who "participate[d] in major adversary decision[s]" in Moore's case. *Williams*, 136 S. Ct. at 1906.    Therefore, McMaster's premature denial of clemency violated Moore's due process rights under the Fourteenth Amendment.  *See Young v. Hayes,* 218 F.3d 850, 853 (2000) (holding that "[t]he Constitution of the United States does not require that a state have a clemency procedure, but, in our view, it does require that, if such a procedure is created, *the state's own officials refrain from frustrating it…*") (emphasis added).

62.    Notwithstanding McMaster's premature denial of clemency, Moore wishes to file a clemency application and have it fairly reviewed—a right granted to him under the Constitution of South Carolina and the applicable laws of South Carolina.

63.    Because McMaster was the Attorney General of South Carolina during Moore's direct appeal and throughout significant portions of Moore's state post-conviction proceedings, he has an inherent conflict of interest that would preclude him from fairly considering Moore's clemency request in the future. Therefore, McMaster cannot satisfy the requirement of an impartial executive authority.  Because Defendant McMaster is not impartial, if Moore's clemency application was decided by the Governor's Office, it would be a clear violation of Moore's right to due process of law under the United States Constitution.

64.    Failure to recuse the Governor's Office from ruling on Moore's clemency application would not only violate Moore's due process rights, but also undermine society's confidence in the integrity of South Carolina's criminal justice and its implementation of the death

penalty.[61]  Accordingly, not only from the perspective of Moore's due process rights, but also considering public's confidence in South Carolina's criminal justice system, it is important that the Governor's Office is required to recuse itself from deciding Moore's clemency application.

## Count II:  Injunctive Relief

65.    Moore incorporates by reference each statement, and each allegation, set forth in this Complaint as if fully set forth herein.

66.    Moore has a legal right to a clemency proceeding conducted and decided by a neutral and impartial decision-maker who is untainted by his prior, personal participation in the prosecution of Moore.

67.    Moore, who is scheduled to be executed on **November 1, 2024**, before this case can be decided on the merits, will suffer the irreparable harm of execution unless a stay of execution and/or a temporary restraining order is issued by this Court and a preliminary injunction is issued by this Court, pending further orders of the Court and a decision on the merits.

68.    The injury to Moore if injunctive relief is denied—loss of life—outweighs any conceivable loss to Defendant if a stay of execution, temporary restraining order, and/or a preliminary injunction is issued.

69.    Moore seeks a stay of execution and/or temporary restraining order; and preliminary and permanent injunctive relief as fully set forth in the Prayer for Relief.

---

[61] *See* Brief of Current and Former Governors as Amici Curiae in Support of Petitioner in *Harbinson v. Bell*, 2008 WL 4264488 at *8 (former governors from death penalty states emphasized the importance of exercising clemency power in a fair manner to bolster "public confidence in the criminal justice system"); *see also Woodard*, 523 U.S. at 294–295 ("It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion….Those considerations apply with special force to the final stage of the decisional process that precedes an official depreciation of life") (Stevens, J., dissenting).

**Count III:  Declaratory Relief**

70.    Moore incorporates by reference each statement, and each allegation, set forth in this complaint as if fully set forth herein.

71.    Moore seeks a declaration that the exercise of McMaster's power to grant or deny clemency in regard to any petition for clemency by Plaintiff would constitute a violation of Plaintiff's right to due process under the United States Constitution.

72.    Moore seeks a declaration that because McMaster is barred from considering Moore's clemency applications, he must refer his application to the Parole Board and the Parole Board must decide the merits of Moore's clemency application. The decision of the Parole Board in Moore's clemency proceedings shall be binding upon Defendant McMaster and any of his agents or any persons or governmental departments directly or indirectly supervised by him.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully seeks the following relief:

A.    Treat this Complaint as an affidavit in support of Plaintiff's request a stay of execution and/or temporary restraining order, and for other preliminary and permanent injunctive relief.

B.    Issue a stay of execution and/or temporary restraining order prohibiting Defendant or his Agents from carrying out an execution pending further orders from this Court, where "Agent" refers to any agent of Defendant or any individual, entity or governmental department supervised, either directly or indirectly, by Defendant.

C.    Issue a permanent injunction barring Defendant from conducing any clemency proceedings instituted pursuant to Plaintiff's petition for clemency, or from rendering a decision with respect thereto, and barring Defendant and his Agents (as

33

defined above) from carrying out an execution unless Plaintiff has had the opportunity to have his request for executive clemency, including commutation of the death sentence, decided by arbiters that are impartial, without any conflict of interest, and did not serve as counsel for the State at any time in Plaintiff's court proceedings.

D.      Enter a declaratory judgment that Defendant's conduct or supervision of Plaintiff's clemency proceedings, or Defendant's rendering of a decision with respect to Plaintiff's clemency application, would constitute a violation of Plaintiff's rights to due process under the United States Constitution.

E.      Issue an order that Defendant shall refer Plaintiff's clemency application to the Parole Board and the Parole Board must decide the merits of Plaintiff's clemency application; and that the Parole Board's decision in Plaintiff's clemency proceedings shall be binding upon Defendant and his Agents (as defined above).

F.      Award any other remedy or relief to which Plaintiff may be entitled and which is deemed appropriate by the Court.

Respectfully submitted,

Dated:  October 7, 2024                          By:  s/Lindsey S. Vann

LINDSEY S. VANN (Fed. ID # 11872)        JOHN H. BLUME (Fed. ID #1360)
ALLISON FRANZ (Fed. ID # 13953)          CORNELL UNIVERSITY
JUSTICE 360                              112 MYRON TAYLOR HALL
900 ELMWOOD AVE, SUITE 200               ITHACA, NY 14853
COLUMBIA, SC 29201                       (607) 255-1030
(803) 765-1044

*Counsel for Plaintiff*

34