# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

RICHARD BERNARD MOORE,

          *Plaintiff,*

  v.

HENRY D. MCMASTER, in his personal capacity
and in his official capacity as Governor of
South Carolina,

          *Defendant.*

Civil Action No.: 3:24-cv-5580-MGL-TER

**GOVERNOR MCMASTER'S RESPONSE TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Defendant Henry D. McMaster, in his personal capacity[*] and in his official capacity as

Governor of the State of South Carolina, responds to Plaintiff Richard Bernard Moore's Motion

for Temporary Restraining Order and Preliminary Injunction (ECF No. 4).

## <u>INTRODUCTION</u>

Clemency is a power exercised, "from time immemorial, by the executive." *United States*

*v. Wilson*, 32 U.S. (7 Pet.) 150, 160 (1833). And exclusively so. *Schick v. Reed*, 419 U.S. 256, 266

(1974). These proceedings "are conducted by the executive branch, independent of direct appeal

and collateral relief proceedings." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 284 (1998)

(opinion of Rehnquist, C.J.). "[P]ardon and commutation decisions" therefore "have not

traditionally been the business of courts." *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464

---

[*] It's unclear why Moore tries to bring a claim against the Governor in his personal capacity. The crux of Moore's claim is for injunctive relief to prohibit the Governor from deciding Moore's (apparently forthcoming) clemency petition and to require the Governor to submit petition to the Board of Paroles and Pardons. The Governor could only take such actions in his official capacity, and a plaintiff can obtain injunctive relief against official-capacity defendants. *See Ex parte Young*, 209 U.S. 123 (1908). A declaratory judgment, meanwhile, is not a standalone claim that Moore could bring against the Governor in his personal capacity; it is merely a remedy for a claim. *See Gibraltar, P.R., Inc. v. Otoki Grp., Inc.*, 104 F.3d 616, 619 (4th Cir. 1997); *Poly-Med, Inc. v. Novus Sci. Pte. Ltd.*, No. 8:15-CV-01964-JMC, 2018 WL 4223443, at *3 (D.S.C. Aug. 27, 2018) ("a declaratory judgment is a remedy, not a right or independent claim").

(1981) (cleaned up).

The caveat in that "unbroken practice" of exclusive executive clemency power, *Schick*, 419 U.S. at 266, is the requirement that clemency decisions cannot be "arbitrar[]y," *Woodard*, 523 U.S. at 289 (opinion of O'Connor, J.). An executive may not, for instance, "flip[] a coin to determine whether to grant clemency." *Id.* This is a "*minimal* procedural safeguard[]." *Id.* (emphasis in original). Courts have unsurprisingly recognized that this is a low bar.

Undeterred by practice and precedent or by the text of the South Carolina Constitution, Richard Moore urges the Court to break new ground on clemency. He insists that the Governor is "incapa[ble] to serve as a fair and impartial decision-maker," Compl. ¶ 7, ECF No. 1, in his clemency proceeding because the Governor served as attorney general while Moore's case was on appeal and has expressed a disinclination to commute a capital sentence. Moore's argument lacks merit. For starters, nothing he alleges shows that executive clemency in South Carolina is arbitrary in any way that remotely resembles what Justice O'Connor's *Woodard* opinion suggested would pose a constitutional problem. Courts—including the Fourth Circuit, *Buchanan v. Gilmore*, 139 F.3d 982 (4th Cir. 1998)—have rejected the theory that a governor who previously served as attorney general during a condemned inmate's legal proceedings is constitutionally barred from deciding a clemency request. And courts have even rejected challenges when governors have gone so far as to announce "a general policy of not granting clemency in capital cases." *Anderson v. Davis*, 279 F.3d 674, 676 (9th Cir. 2002).

Further, Moore's claims are based on the underlying assumption that the Governor will not commute his death sentence. Whatever the Governor ultimately decides, that decision is his alone. Courts have repeatedly held that clemency is exclusive to the executive, *e.g.*, *Schick*, 419 U.S. at 266, and the South Carolina Constitution commits that decision to the Governor, S.C. Const. art.

IV, § 14.

Beyond the merits, Moore's request to stay his execution fails for other reasons. Most notably, he discounts the public's interest in finality. *See, e.g.*, *Bucklew v. Precythe*, 587 U.S. 119, 149 (2019). His sentence was imposed more than two decades ago. In the years since, he has been afforded opportunities to challenge his conviction and sentence in direct and collateral proceedings and to contest various aspects of the State's execution procedures. He is not entitled to more delay of his execution to have the courts address a question to which they have given a consistent answer for centuries.

## STATEMENT OF FACTS

### A.     Moore is sentenced to death for murder, and courts reject his appeals.

On September 16, 1999, Richard Moore could not come up with the money to buy crack cocaine. *Moore v. Stirling*, 952 F.3d 174, 177 (4th Cir. 2020). Searching for cash, Moore robbed a convenience store in Spartanburg County. *Id.* In doing so, Moore grabbed a .45 caliber semi-automatic pistol from behind the counter, and while holding the store clerk's hands, fired at a customer playing video poker. *Id.* That customer "dropped to the floor and played dead." *Id.* While on the floor, the customer heard several more gunshots during a struggle, and after hearing someone leave the store, the customer got up and found the clerk on the floor, with a gunshot wound through the heart. *Id.* The clerk died minutes later. *Id.*

The drug dealer refused to sell Moore crack cocaine after Moore said he "had done something bad" and had a gunshot wound in his left arm. *Id.* at 178. Moore crashed his truck into a telephone pole, and when a sheriff's deputy approached the scene, Moore was "bleeding profusely." *Id.* The deputy ordered Moore to the ground, and "Moore repeatedly shouted, 'I did it, I did it, I give up, I give up.'" *Id.* When he was arrested, Moore had a bag with $1,408 in cash from

the convenience store and an open pocketknife in his possession. *Id.* The .45 caliber gun used to kill the clerk "was found discarded on a nearby highway." *Id.*

Moore was tried, convicted, and sentenced to death in 2001. *Id.* During his trial, Charlie Condon was attorney general.

The S.C. Supreme Court affirmed Moore's conviction and sentence in 2004, at which point Governor McMaster was attorney general. *State v. Moore*, 357 S.C. 458, 461, 593 S.E.2d 608, 610 (2004). State post-conviction relief proceedings began while the Governor was still attorney general, but the PCR hearing didn't commence until January 31, 2011. *See Moore v. Stirling*, No. 4:14-CV-4691-MGL-TER, 2017 WL 8294058, at *7 (D.S.C. Dec. 28, 2017) (recounting the procedural history of the case). By that time, Alan Wilson was attorney general, having been sworn in earlier that month.

Eventually, state and federal courts rejected both his direct and collateral appeals. *Moore*, 952 F.3d 174, *cert. denied*, 141 S. Ct. 680 (2020). And then the S.C. Supreme Court rejected another habeas claim based on a proportionality review of Moore's death sentence. *Moore v. Stirling*, 436 S.C. 207, 871 S.E.2d 423 (2022). All of this took place during General Wilson's tenure.

**B.      Moore has challenged various aspects of how his execution will be carried out.**

Even after courts rejected his challenges to his conviction and sentence, Moore has litigated multiple cases challenging how the State may carry out his execution. At first, Moore's challenge focused on the method of execution, but the S.C. Supreme Court rejected his claims that electrocution and the firing squad violate the S.C. Constitution and that the State's method-of-execution statute violates due process. *Owens v. Stirling*, 443 S.C. 246, 904 S.E.2d 580 (2024).

Having failed on those fronts, Moore recently turned his attention to testing the

constitutionality of the State's Shield Statute (which enabled SCDC to obtain pentobarbital to make lethal injection available as a method of execution—the method that Moore has said was the most humane way to carry out an execution). *See Bixby, et al. v. Stirling*, No. 3:24-cv-5072-JDA (D.S.C.). A motion to dismiss is pending in that case.

The S.C. Supreme Court issued an execution notice for Moore on October 4, 2024. *See* Execution Notice, No. 2024-001599 (S.C. Oct. 4, 2024). Moore's execution is scheduled for November 1, 2024. *See* S.C. Code Ann. § 17-25-370 (an execution is "on the fourth Friday" after the notice is issued).

Now, Moore's latest challenge is to the Governor's clemency authority. He alleges that he cannot receive fair consideration for clemency because the Governor previously served as attorney general while his case was on appeal and has made statements showing a disinclination for granting clemency. Moore demands that the Board of Paroles and Pardons consider his clemency petition and that the Governor be bound by the Board's decision. With his complaint, he seeks injunctive relief to stay his execution so that he can litigate his new claim.

### C. The Governor has exclusive authority to commute a death sentence in South Carolina.

The Governor has "the power only to grant reprieves and to commute a sentence of death to that of life imprisonment." S.C. Const. art. IV, § 14. In non-capital cases, clemency authority is vested in the Board of Paroles and Pardons. *See* S.C. Code Ann. § 24-21-5 *et seq.* The Governor "may" refer petitions for executive clemency to the Board, but the "Governor may act on any petition without reference to the board." *Id.* If the Governor chooses to refer a petition to the Board, the Governor remains free to "not adopt the [Board's] recommendation." *Id.*

### <u>STANDARD OF REVIEW</u>

"A preliminary injunction is an extraordinary and drastic remedy" and "is never awarded

as of right." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (internal quotation mark omitted). Plus, there "is the strong presumption against granting a stay of execution." *Baker v. Saar*, 402 F. Supp. 2d 606, 607 (D. Md. 2005). A plaintiff must show four elements to obtain that relief: (1) likelihood of success on the merits, (2) irreparable harm, (3) the balance of the hardship tips in his favor, and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Witherspoon v. Tucker*, No. 9:12-cv-3446-MGL, 2013 WL 5145630, at *4 (D.S.C. Sept. 12, 2013) (elements for TRO are the same). If a plaintiff fails to satisfy one factor, a court need not consider the remaining factors. *See Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023).

## ARGUMENT

### I.      Moore is unlikely to prevail on the merits.

To shape his arguments into a due process claim, Moore points to two reasons why he contends the Governor cannot exercise his constitutional clemency authority. First, Moore cites the Governor's service as attorney general while Moore case was on direct appeal and in the early post-conviction relief stages. *See, e.g.*, Compl. ¶ 60, ECF No. 1. Second, he relies on the Governor's previous comments about having not been inclined to grant clemency. *See, e.g.*, *id.* ¶ 61. Neither allegation is enough to establish a likelihood of success, and Moore's claims here suffer from many shortcomings.

#### A.      Nothing Moore alleges is a due process violation.

An inmate "has no constitutional or inherent right to commutation of his sentence." *Dumschat*, 452 U.S. at 464 (cleaned up). "[P]ardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review." *Id.*

The most that the Supreme Court has ever recognized is that "some *minimal* procedural

safeguards apply to clemency proceedings." *Woodard*, 523 U.S. at 289 (opinion of O'Connor, J.) (emphasis in original). The examples that Justice O'Connor gave for when "[j]udicial intervention *might* . . . be warranted" were "a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Id.* (emphasis added).

Courts have understandably taken a narrow view of *Woodard*. As the Eleventh Circuit put it, "[t]he key word here is 'minimal.'" *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 794 F.3d 1327, 1331 (11th Cir. 2015). The Fifth Circuit explained that *Woodard*'s standard can be satisfied only in "extreme situations." *Faulder v. Tex. Bd. of Pardons & Paroles*, 178 F.3d 343, 344 (5th Cir. 1999). The Tenth Circuit posited that *Woodard* simply requires that a clemency decision "not be wholly arbitrary, capricious or based upon whim." *Duvall v. Keating*, 162 F.3d 1058, 1061 (10th Cir. 1998). And the North Carolina Supreme Court held that *Woodard* does not require "the equivalent of a judicial arbiter to consider [an inmate's] clemency request." *Bacon v. Lee*, 549 S.E.2d 840, 854 (N.C. 2001).

Even accepting Moore's allegations as true, nothing he alleges comes close to an arbitrary process. Justice O'Connor's coin flip example illustrates what would fail: a decision left to chance or made at random. That's not the case here. Indeed, Moore does not allege it is. Instead, he extends the metaphor, claiming the "coin" is "weighted." Compl. ¶ 54, ECF No. 1. But what's missing from his argument is any caselaw to support it. He pulls on threads from different lines of cases (from procedural due process generally to enemy combatants to judicial recusal—all of which differ from clemency in important ways), but he does not point to a single case holding what he argues. For good reason. The caselaw is against him. As is logic.

### 1. The Governor's previous service as attorney general.

Courts have consistently rejected Moore's theory that a governor's previous service as attorney general creates a conflict. The Eastern District of Arkansas rejected Moore's argument, explaining that a condemned inmate's federal constitutional rights were not violated because the governor deciding his clemency petition was previously the attorney general overseeing the inmate's appeal. *Pickens v. Tucker*, 851 F. Supp. 363, 364 (E.D. Ark. 1994). Looking to the rule of necessity, the district court explained that "[t]he power to grant clemency to [the inmate] is vested solely in the individual who occupies the office of Governor" and that the "Arkansas Constitution gives it to no other individual as long as he is within the state and in full possession of his faculties," so if the governor "does not exercise his power to grant or deny clemency, there is no one else able to do so." *Id.* at 366; *see also id.* at 365 ("While President Clinton was Governor, he made a clemency decision in at least one death case in which he had appeared as Attorney General."). Similarly unpersuaded, the full Eighth Circuit affirmed the decision not to stay the execution. *Pickens v. Tucker*, 23 F.3d 1477 (8th Cir.) (en banc), *cert. denied*, 511 U.S. 1079 (1994).

Citing *Pickens*, the Fourth Circuit has also rejected Moore's theory. A Virginia inmate made this argument about Governor Gilmore, who had previously served as attorney general. After a district court stayed his execution, the Fourth Circuit vacated the stay, and the inmate was executed that same day. *Buchanan*, 139 F.3d at 984.

Although *Buchanan* came before *Woodard*, *Woodard* does not undermine *Buchanan*. The North Carolina Supreme Court has shown as much. In a post-*Woodard* case, Governor Easley had served as attorney general for much of a condemned inmate's proceedings (as well as having served as a local prosecutor in the case before that), and the inmate challenged "Governor Easley's consideration of clemency requests" under "the Fourteenth Amendment Due Process Clause in

light of the *Woodard* decision." *Bacon*, 549 S.E.2d at 849. That court recognized that "federal courts have generally followed a cautious approach to the question of the amount of process due inmates seeking clemency." *Id.* After reviewing these cases, the court "conclude[d], after review of *Woodard*, that state clemency procedures generally comport with due process when a prisoner is afforded notice and the opportunity to participate in clemency procedures, and the clemency decision, though substantively a discretionary one, is not reached by means of a procedure such as a coin toss." *Id.* at 849–50 (footnote omitted). Thus, the inmate's due process right was not violated because the governor had previously served as attorney general, either under an "inherent conflict" or "actual bias" theory. *Id.* at 850–51.

Governor McMaster's previous service as attorney general therefore does not require his recusal from deciding a clemency petition now. Not only does caselaw not support as much, but neither does logic. As for caselaw, Moore immediately runs into *Buchanan*. *See* 139 F.3d at 984. The Fourth Circuit's decision stands as an insurmountable hurdle to Moore's theory that the Governor's service as attorney general is constitutionally problematic. And if a more detailed analysis were necessary, *Bacon* provides it (post-*Woodward*, no less), carefully explaining the legal and logical flaws in Moore's theory.

But even without *Buchanan*, Moore's claim fails. Moore would have this Court ignore not only the plain text of the state constitution but also the realities of our political life. Nine current governors across the United States were previously attorneys general. That so many attorneys general are later elected governor shouldn't be a surprise. As Judge Wilkinson once commented, "[e]very attorney general who looks in the mirror sees a governor." *N.C. State Conf. of NAACP v. Berger*, 999 F.3d 915, 939 (4th Cir. 2021) (Wilkinson, J., dissenting), *rev'd*, 597 U.S. 179 (2022). If Moore has his way, every time a State elects an attorney general as governor, the State will

upend its constitutionally prescribed clemency process. Such a result makes no sense, which is why no case holds as much and why constitutions do not prelude an attorney general-turned-governor from exercising the clemency power. To the contrary, the North Carolina Supreme Court wisely rejected the "assertion that the people's elected executive could be divested of one of his or her express constitutional powers, in this case the exclusive authority over clemency decisions under [the state constitution], because he or she previously served as Attorney General." *Bacon*, 549 S.E.2d at 851.

Moore also displays a fundamental misunderstanding of the differences in the role of attorney general as prosecutor and of governor as chief executive with clemency authority. The attorney general is "the chief prosecuting officer of the State with authority to supervise the prosecution of all criminal cases in courts of record." S.C. Const. art. V, § 24. Meanwhile, the Governor is the "Chief Magistrate" with "supreme executive authority." *Id.* art. IV, § 1. Part of that authority is clemency in capital cases. *Id.* art IV, § 14. Given the differences in these constitutional roles, the fact that someone served as attorney general while a criminal case was on appeal does not mean that the person cannot later consider clemency for a defendant. After all, clemency "is an act of grace." *Crooks v. Sanders*, 123 S.C. 28, 33, 115 S.E. 760, 762 (1922). Grace is given to someone who is undeserving of a reprieve, so granting clemency in no way requires the decisionmaker to "renounce" his previous work. Compl. ¶ 6, ECF No. 1.

Because clemency is different from criminal proceedings, it plays a unique role in the criminal justice system, and some official must exercise that power. As other courts have noted, the rule of necessity requires that a decision be made, *e.g.*, *Buchanan*, 139 F.3d at 984; *Bacon*, 549 S.E.2d at 718–19, and the Governor is the only person constitutionally and statutorily authorized to make that decision in South Carolina, *see* S.C. Const. art. IV, § 14. Even if due process might

require a clemency decisionmaker who hadn't had any prior involvement in an inmate's proceedings, that's not possible in every case. A former attorney general who became governor must exercise that authority when the question of clemency arises. *See Bacon*, 549 S.E.2d at 853 ("we do not read *Woodard* to diminish substantially the undeniable textual commitment of clemency to the Executive Branch of government"); *cf. United States v. Will*, 449 U.S. 200, 213 (1980) (discussing the history of the rule of necessity and how a person could be a judge in his own case "when there was no provision for appointment of another judge").

### 2. The Governor's previous statements.

In the same vein, courts have rejected claims that a governor's public statements preclude that governor from deciding whether to grant clemency. For instance, Missouri's former governor made his support of capital punishment known while serving as attorney general. That fact did not mean that the governor "simply rolled a dice to determine whether to grant clemency or intentionally interfered with [the inmate's] access to full clemency proceedings." *Link v. Nixon*, No. 2:11-CV-4040-NKL, 2011 WL 529577, at *4 (W.D. Mo. Feb. 7, 2011). The inmate's theory was really that the governor was "simply predisposed to reject his petition for clemency," but that claim "fail[ed] to state a claim for which relief may be granted." *Id.* Even a blanket policy against clemency does not violate *Woodard*. "Courts have uniformly rejected allegations that due process is violated by a governor who adopts a general policy of not granting clemency in capital cases." *Anderson*, 279 F.3d at 676; *accord Bryan v. DeSantis*, 343 So. 3d 127, 128 (Fla. Dist. Ct. App. 2022).

Governor McMaster's comments on clemency thus do not give rise to any cognizable due process claim. In the first place, Moore overreads the Governor's comments from 2022. The Governor stated, "I have no intention to commute a sentence." Henry McMaster, *Governor*

*McMaster Media Avail 4/20/22*, at 0:46, youtube.com (Apr. 20, 2022), https://tinyurl.com/mpvbtv49. That was a statement of his thought at that time, in that context. It did not mean that he would not consider what might be submitted to him in the future and remain open to granting executive clemency. Lest there be any doubt, the Governor "carefully considered and thoughtfully reviewed" Freddie Owens's clemency application before Owens's execution last month. Letter from Gov. McMaster to Director Stirling (Sept. 20, 2024), https://tinyurl.com/3dh54tfx. As the Governor explained in the days before Owens's execution, he "tr[ies] to get all the facts that are available and when the time comes to announce that decision," he would do so. Henry McMaster, *Gov. Media Avails on Execution*, at 6:01, youtube.com (Oct. 8, 2024), https://tinyurl.com/3k3w8efj (statement from Sept. 12, 2024). And as Governor McMaster acknowledged, a clemency decision is one he "think[s] about . . . every day." *Id.* at 6:23.

That the Governor ultimately decided not to commute Owens's death sentence does not mean the Governor will not diligently review each inmate's petition. To suggest the Governor would not (as Moore seems to do, *e.g.*, Compl. ¶ 27, ECF No. 1) implies that the Governor is shirking a constitutionally assigned duty. *Cf.* S.C. Const. art. IV, § 15 (Take Care Clause); Henry McMaster, *Gov Media Avails on Execution*, at 2:58, youtube.com (Oct. 8, 2024), https://tinyurl.com/3k3w8efj (Aug. 29, 2024: "It's just part of the job. I mean, it's an important event for a lot of people for a lot of very good reasons, but it's simply one of these things that the governor of this State has to do.").

And in the second place, Moore wrongly assumes that an announced policy (if in fact that's what the Governor's 2022 statement was) is a constitutional problem. A Florida inmate challenged Governor DeSantis's "blanket policy" to deny clemency. *Bryan*, 343 So. 3d at 128. The Florida court rejected the inmate's *Woodard* argument because "it is not irrational to deny clemency to

murderers or felony sexual offenders." *Id.* at 129. The same logic led a federal court in Missouri to reject the claim that previous statements on capital punishment could support a due process claim, *see Link*, 2011 WL 529577, at *4, and the Ninth Circuit to reject the claim that a general policy against clemency is problematic, *see Anderson*, 279 F.3d at 676. The contrary rule would theoretically preclude a gubernatorial (or even presidential) candidate from expressing skepticism of clemency during a campaign—something that would not only raise First Amendment concerns but also be a disservice to voters. Governor McMaster's previous expressions of skepticism or reluctance regarding clemency thus do not pose a constitutional problem.

**B.    Clemency decisions are exclusive to the executive.**

Underlying Moore's demand for judicial intervention is his belief that the Governor will not grant his clemency petition. *See* Compl. ¶ 29, ECF No. 1 ("the probability that McMaster would grant clemency to any death row inmate is low"). Going back to the coin-flip metaphor, Moore claims that a coin toss would be "a fairer procedure," *Id.* ¶ 8, but that assertion is merely the recognition that a coin flip gives him a 50/50 chance, which he thinks are better odds than he has with the Governor. His lack of confidence in his yet-to-be-filed clemency petition cannot support a viable claim in federal court. *E.g.*, *Sepulvado v. La. Bd. of Pardons & Parole*, 171 F. App'x 470, 473 (5th Cir. 2006) ("His complaint alleges, for example, the Governor rarely grants clemency to violent offenders; this, however, does not state a claim for a due-process violation.").

"A pardon" has long been understood as "an act of grace." *Wilson*, 32 U.S. (7 Pet.) at 160; *cf.* 4 W. Blackstone, *Commentaries on the Laws of England* 391 (1769) (discussing the Crown's power to pardon public wrongs). "A decision whether to commute a long-term sentence generally depends not simply on objective factfinding, but also on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision." *Dumschat*, 452 U.S. at 464;

*see also Woodard*, 523 U.S. at 280–81 (opinion of Rehnquist, C.J.) ("the heart of executive clemency, which is to grant clemency as a matter of grace, . . . allow[s] the executive to consider a wide range of factors not comprehended by earlier judicial proceedings and sentencing determinations"). Executive clemency is therefore intentionally different from the judicial process. *See Bacon*, 549 S.E.2d at 853 ("clemency determinations by the Executive Branch are fundamentally different than adjudicatory proceedings within the Judicial Branch"). Moore seems to recognize this reality at points, *see* Compl. ¶ 39, ECF No. 1, but then forget it at others, *see id.* ¶ 56. Yet the distinction is real and meaningful. Clemency involves the executive's "complete discretion," *Woodard*, 523 U.S. at 278 (opinion of the Court), so an inmate may never have more than "a unilateral hope" that he will have his sentence commuted, *Dumschat*, 452 U.S. at 465.

Given this entrenched historical understanding, courts have repeatedly and consistently held that the executive holds the exclusive discretionary authority for whether to grant clemency. *See, e.g.*, *Rosemond v. Hudgins*, 92 F.4th 518, 525 (4th Cir. 2024) (federal clemency); *McDonald v. Thomas*, 40 P.3d 819, 828 (Ariz. 2002); *Smith v. Huckabee*, No. 06-917, 2007 WL 701045, at *3 (Ark. Mar. 8, 2007); *Santos v. Brown*, 189 Cal. Rptr. 3d 234, 248 (Cal. Ct. App. 2015); *Valle v. Florida*, 70 So. 3d 530, 551 (Fla. 2011); *Trueblood v. State*, 790 N.E.2d 97, 97 (Ind. 2003); *Foley v. Beshear*, 462 S.W.3d 389, 392 (Ky. 2015); *Louisiana v. Lee*, 370 So. 3d 408, 412 (La. 2023); *Missouri ex rel. Parson v. Walker*, 690 S.W.3d 477, 485 (Mo. 2024); *In re Petition for Expungement of Crim. Rec. Belonging to T.O.*, 242 A.3d 842, 851 (N.J. 2021); *Bacon*, 549 S.E.2d at 847; *Ohio ex rel. Maurer v. Sheward*, 518, 644 N.E.2d 369, 373 (Ohio 1994); *Vandyke v. Texas*, 538 S.W.3d 561, 573 (Tex. Crim. App. 2017); *Weldon v. Gordon*, 517 P.3d 550, 556 (Wyo. 2022).

Like these other jurisdictions, South Carolina's clemency power for a death sentence is textually and exclusively entrusted to the Governor. *See* S.C. Const. art. IV, § 14. When the

Constitution grants a power to one of the political branches like that, courts must not interfere with the exercise of that power. *See S.C. Pub. Int. Found. v. Jud. Merit Selection Comm'n*, 369 S.C. 139, 142–43, 632 S.E.2d 277, 278 (2006). Moore admits only that "the Governor's power remain[s] central" in whether to commute a death sentence, Compl. ¶ 31, ECF No. 1, but that's an understatement. The Governor's power is exclusive. *See, e.g.*, S.C. Att'y Gen. Op., 1959 WL 10434, at *1 (S.C.A.G. July 17, 1959) ("In the event that he decides to act upon the petition without reference then he acts at his discretion and is accountable to no one."). Whether or when a governor exercises his clemency power is his choice, and the ballot box is the check on the use (or nonuse) of the clemency power, which is why courts have recognized that the decision whether to commute a sentence is nonjusticiable. *See, e.g.*, *Bacon*, 549 S.E.2d at 854; *Weldon*, 517 P.3d at 556.

This unbroken line of cases means that the pages Moore spends discussing the importance of clemency given recent judicial and statutory decisions is immaterial here. *See* Compl. ¶¶ 39–49, ECF No. 1. Of course, clemency is integral to constitutional system. *See Herrera v. Collins*, 506 U.S. 390, 412–15 (1993) (discussing the history of clemency in England and the United States). But clemency's historical significance or any current trends making it important today do not change the fact that the decision whether to grant clemency rests solely with the chief executive, free from judicial interference. However Moore may try to dress up his claim, at bottom, it's simple: He doesn't think the Governor is likely to grant him clemency, *e.g.*, ECF No. 4, at 3 (claiming the Governor "has a long-documented animosity to clemency and similar grace proceedings"), so he wants the Court to excise the Governor's authority and delegate the clemency decision to someone else. But doing so would break with precedent and constitutional text.

C. **The Court cannot redline the South Carolina Constitution.**

Even if Moore's due process claim had merit, he demands relief that this Court lacks the

authority to grant. Moore seeks a declaration that the Governor "must refer his application to the Parole Board and the Parole Board must decide the merits of Moore's clemency application," which "shall be binding" on the Governor. Compl. ¶ 72, ECF No. 1.

This claim is no more than an invitation for the Court to rewrite the state constitution. The Governor of South Carolina once had the "power to grant reprieves, commutations and pardons after conviction (except in cases of impeachment, in such manner, on such terms and under such restrictions as he shall think proper." S.C. Const. art. IV, § 11 (1895). But in 1948, the People of South Carolina chose to limit the Governor's broad clemency authority to capital cases only, *see* 1949 S.C. Acts No. 40 (ratifying constitutional amendment), as part of Governor Thurmond's efforts to reform "the vicious pardon racket in South Carolina under which criminals, with money and influence, bought their way out of the State Penitentiary," Strom Thurmond, *Address on Accomplishments of the 1949 General Assembly* 1 (July 25, 1949), https://tinyurl.com/bdzj7rmz. When the West Committee proposed substantial revisions to the S.C. Constitution two decades later, it "fe[lt] very strongly that the present constitutional provision giving the Governor the power to grant a reprieve and to commute a death sentence to life imprisonment should be continued." *Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895*, at 55 (1969).

And so today, the Governor possesses "the power only to grant reprieves and to commute a sentence of death to that of life imprisonment." S.C. Const. art. IV, § 14. No one else. Other decisions about parole and pardons belong to the Board of Parole and Pardons, *see* S.C. Code Ann. § 24-21-5 *et seq.*, but the Board has no independent authority in capital cases. The Governor "may" refer clemency petitions to the Board, but the "Governor may act on any petition without reference to the board." *Id.* Even if the Governor refers a petition to the Board, the Governor may still choose

to "not adopt the [Board's] recommendation." *Id.*

Moore invites this Court to rewrite state law by requiring the Governor to refer Moore's clemency petition to the Board and to be bound by the Board's recommendation, saying the Board "would be the most suitable candidate to replace Governor McMaster as a decision-maker in Moore's clemency proceedings." Compl. ¶ 38, ECF No. 1. But that's just a roundabout way of asking the Court to change state law. "[A] federal court," however, "lacks power to rewrite state statutes." *Cooper v. N.C. State Bd. of Elections*, No. 5:08-CV-423-D, 2009 WL 9081691, at *10 (E.D.N.C. June 12, 2009) (citing *United States v. Butler*, 297 U.S. 1, 62–63 (1936)); *see also Parke, Davis & Co. v. Health Cross Stores, Inc.*, 364 F.2d 214, 215 (4th Cir. 1966) (the court has "no leave to rewrite [a state's] constitution"). Doing so would pose grave federalism concerns and reject the "fundamental principle" that the "Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). The Court therefore cannot grant Moore the relief he seeks to have the Board, rather than the Governor, decide his clemency petition. The Governor—and the Governor alone—must exercise that power. *See* S.C. Const. art. IV, § 14; *cf. Buchanan*, 139 F.3d at 984; *Bacon*, 549 S.E.2d at 718–19 (rule of necessity).

If Moore's demand for the Board to decide his clemency petition were something other than an attempt to redline the S.C. Constitution, it would still be a request for a mandatory injunction requiring the Governor to take certain action and to exercise his discretion in a specific manner. An injunction against the chief executive of a sovereign is "an extraordinary remedy." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion) (cleaned up) (discussing a theoretical injunction against the President). Thus, "[c]ourts generally lack authority to enjoin the President from performing discretionary functions." *Rydie v. Biden*, No. 21-2359, 2022 WL

1153249, at *2 n.3 (4th Cir. Apr. 19, 2022) (citing *Franklin*, 505 U.S. at 802–03). The same principle applies to the Governor in the exercise of his discretionary authority, and there is no basis to order him to exercise his discretion in a particular way. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166 (1803) ("whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion").

### D. Moore is making clemency-related arguments in the wrong forum.

A final flaw with Moore's claim is that it is, in many ways, an attempt to have the federal courts usurp the Governor's exclusive clemency power under South Carolina law. He stresses how (unsurprisingly, in his view) the facts of his case are "unique" and "would not typically warrant the death penalty in South Carolina." Compl. ¶ 21, ECF No. 1; *see also id.* ¶ 26 (claiming his case is "uniquely suitable for the exercise of executive clemency").

Two brief responses dispose of these arguments. The first is that these arguments are properly made to the Governor in a clemency petition. That is the constitutionally prescribed path for clemency in South Carolina. *See* S.C. Const. art. IV, § 14. They have no bearing on Moore's due process claim, and at most they seek to engender judicial sympathy and convince the Court that Moore deserves clemency. But whether he deserves that grace (if anyone can "deserv[e]" grace, Compl. ¶ 20, ECF No. 1, rather than simply receiving it) is irrelevant to who is legally entitled to make the decision whether to bestow that relief.

The second is that, while Moore is quick to quote from Justice Hearn's dissent in his 2022 proportionality case in the S.C. Supreme Court, he neglects to mention what the majority held: "Moore ha[d] not established that his capital sentence is disproportionate." *Moore*, 436 S.C. at 229, 871 S.E.2d at 435. In other words, a decisionmaker who has none of the supposed problems that the Governor has already rejected Moore's arguments that his death sentence was improper.

That is not to say that Moore should not receive clemency. Rather, it simply recognizes that Moore's case for clemency is not as open-and-shut as he predicts. If Moore has arguments about the facts of his case or his rehabilitation since his conviction, *see* Compl. ¶ 26, ECF No. 1, then he can make those arguments to the Governor as part of the "wide range of factors" the Governor might consider, *Woodard*, 523 U.S. at 281 (opinion of Rehnquist, C.J.).

## II. The other factors do not support staying Moore's execution.

### A. Moore's ability to show irreparable harm is not a foregone conclusion.

Moore treats this factor as obviously in his favor, devoting a single paragraph to it. *See* ECF No. 4, at 4. But as one district court reasoned, "[i]rreparable harm, in the context of the death penalty, cannot mean the fact of death" because that "would make analysis of this factor meaningless." *Jackson v. Danberg*, No. CIV. 06-300-SLR, 2011 WL 3205453, at *3 (D. Del. July 27, 2011), *aff'd,* 656 F.3d 157 (3d Cir. 2011); *see also, e.g.*, *Powell v. Thomas*, 784 F. Supp. 2d 1270, 1283 (M.D. Ala. 2011); *Reid v. Johnson*, 333 F. Supp. 2d 543, 550 (E.D. Va. 2004). Instead, a court must consider whether the inmate would suffer some constitutional wrong when his death sentence is carried out. *Jackson*, 2011 WL 3205453, at *3. That logic makes sense, but the Court need not stake out a position on this question because Moore cannot meet the other factors.

### B. The equities and public interest favor the Governor.

Taking the harm to the State and the public interest together, *cf. Nken v. Holder*, 556 U.S. 418, 435 (2009), "[b]oth the State and the victims of crime have an important interest in the timely enforcement of a sentence," *Bucklew*, 587 U.S. at 149; *see also* S.C. Const. art. I, § 24 (victim's bill of rights). Too often, those interests are "frustrated" by "delay through lawsuit after lawsuit." *Bucklew*, 587 U.S. at 149. Moore is no exception: Since 2020, he's filed multiple cases in state and federal courts raising various challenges to his execution. He says he couldn't have filed this

suit until now, *see* ECF No. 4, at 4, but presumably, he'll always have one more challenge, if the courts continue to stay his scheduled execution. Condemned inmates always do. Moore discounts the State's interest in finality, claiming that the State "will suffer little harm from a delayed execution." ECF No. 4, at 4. But "[t]he people of [South Carolina], the surviving victims of Mr. [Moore]'s crimes, and others like them deserve better." *Id.* Indeed, there is even a "moral dimension" to the State's interest in the finality that comes with carrying out Moore's sentence. *Calderon v. Thompson*, 523 U.S. 538, 556 (1998).

Moore also ignores the State's separate interest in keeping federal courts from interfering with its criminal judgments. To be sure, federal courts "say what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177. But in doing so, they "must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). "The proper role of courts is to ensure that method-of-execution challenges to lawfully issued sentences are resolved fairly and expeditiously. Courts should police carefully against attempts to use such challenges as tools to interpose unjustified delay." *Bucklew*, 587 U.S. at 150. From this role flows the common-sense conclusion that "[l]ast-minute stays should be the extreme exception, not the norm." *Id.* In other words, courts must guard against the "Groundhog Day" that is capital litigation, *Glossip v. Gross*, 576 U.S. 863, 893 (2015) (Scalia, J., concurring), so that duly imposed, fully appealed judgments can be carried out—or clemency can be granted—and the "seemingly endless proceedings" can end (one way or another), *Baze v. Rees*, 553 U.S. 35, 69 (2008) (Alito, J., concurring).

## CONCLUSION

The Court should deny the Motion for Temporary Restraining Order and Preliminary Injunction.

If the Court does grant Moore any injunctive relief, the Governor requests that the Court stay any such injunction pending appeal under Federal Rule of Civil Procedure 62 and Federal Rule of Appellate Procedure 8(a)(1).

<div style="margin-left:40%">

Respectfully Submitted,

s/Wm. Grayson Lambert
Thomas A. Limehouse, Jr. (Fed. Bar No. 12148)
*Chief Legal Counsel*
Wm. Grayson Lambert (Fed. Bar No. 11761)
*Senior Litigation Counsel &*
*Chief Deputy Legal Counsel*
Erica W. Shedd (Fed. Bar No. 13206)
*Deputy Legal Counsel*
Tyra S. McBride (Fed. Bar No. 13324)
*Deputy Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov
eshedd@governor.sc.gov
tmcbride@governor.sc.gov

*Counsel for Governor McMaster*

</div>

October 9, 2024